Francis **WRIGHT** and Matt S. Hughes, Trustee in Bankruptcy for Hank Wright's Sons, Inc., a corporation, and Matt S. Hughes, Trustee in Bankruptcy for Francis Wright, Plaintiffs,

v.

**UNITED STATES RUBBER COMPANY,** Defendant.

Civ. No. 62–369.

United States District Court
D. Oregon.
Sept. 8, 1967.

Walter Evans, Jr., Portland, Or., for plaintiffs.

Arthur S. Vosburg, Vosburg, Joss, Hedlund & Bosch, Portland, Or., for defendant.

## OPINION

KILKENNY, District Judge:

Plaintiff Francis Wright had, for many years, been manager of Truck Tire Sales for the Firestone Tire and Rubber Company in the Portland area. In early 1961, plaintiff began laying plans to go into business for himself. In mid-summer 1961, plaintiff was approached by defendant company and was urged to associate himself with them in his venture.

During the month of August several meetings were held between Wright and representatives of defendant. The extent of operations and the financing of the enterprise were the topics of discussion at these meetings. It was the plan at this time that Wright's operations would be expanded and that defendant would finance him on condition that he furnish a satisfactory guarantor. Wright placed an order for retreading equipment with Russ Chamberlain, Inc. on July 30, 1961, and this order was apparently made firm sometime around September 15, 1961.

At the end of September, plaintiff Wright advised defendant that the guarantor they had mutually agreed upon had withdrawn and that plaintiff was unable to furnish a guarantor. Defendant thereupon stated that should plaintiff fulfill various other conditions it would finance the operation. Defendant also proposed that plaintiff expand his operations to include a "Truck Service Station" outlet and "Front-end" and Brake Shop. Negotiations between plaintiff and defendant continued. Plaintiff formed the corporation Hank Wright's Sons, Inc., in which he was the principal stockholder. Plaintiff further, and with the knowledge of the defendant, personally obligated himself on a note for the purchase of equipment by the corporation and negotiated a long term lease on real property.

Throughout this period, plaintiff Wright continued in the employment of Firestone. In mid-December, Firestone learned of the negotiations between plaintiff and defendant and informed plaintiff that he was either to remain a Firestone employee or become a Firestone dealer without any unusual benefits. Wright, thereupon, considering himself "fired" informed Mr. Moran, who was representing defendant corporation in the financing negotiations, that he would have to enter business sooner than anticipated and that he would need considerable financing. As a result, a meeting was held in Seattle on December 26th and 27th. A consignment agreement was executed for $5,000.00 worth of tires, and the financial assistance to

plaintiff by defendant was outlined. Defendant contends that plaintiff knew this financing agreement was subject to approval by the company, and I so find. Shortly thereafter plaintiff corporation commenced operations. Defendant recognized plaintiff as a United States Rubber Company dealer and furnished it with various equipment and supplies.

On March 8, 1962, plaintiffs were informed that the New York office had refused to approve the financing arrangement. As a result of this withdrawal, the Texaco Company withdrew its offer of assistance to the Hank Wright's Sons corporation. In September, 1962, Francis Wright, personally, and Hank Wright's Sons, Inc. filed suit in the United States District Court of Oregon against U. S. Rubber for damages resulting from breach of contract. Subsequently bankruptcy resulted and the trustee was added as a plaintiff to this action.

## ISSUES

The first point at issue in this case is whether there ever was a valid financing contract entered into between plaintiffs and the defendant United States Rubber Company. Plaintiffs contend that the facts give rise to a finding that there were actually two contracts—the first being a unilateral contract entered into in August–September of 1961, and the second being a bilateral contract entered into on December 26–27 of that year. The defendant denies the existence of any contract and further defends that any such contract would be unenforceable for lack of consideration and because of the parol evidence rule and the Statute of Frauds.

A second ground for recovery alleged by the plaintiffs is that they justifiedly relied upon the promises made by the defendant corporation and, therefore, damages should be awarded on the basis of promissory estoppel.

1. Was a valid unilateral contract entered into between plaintiff Francis Wright and defendant United States Rubber in the fall of 1961?

In support of its contention that there existed a valid unilateral contract, plaintiff states that in October and November, 1961, U. S. Rubber made the following offer: to furnish financing (through cash loans and extended credit), to furnish sales assistance (advertising, service trucks, free pick up and delivery service), and to grant various sales advantages. Wright accepted this offer by performing the following act: obtaining housing, obtaining equipment, and forming a corporation in order to secure U. S. Rubber's investment.

■ 1(a). The first important question is whether the facts give rise to an enforceable unilateral contract. When one takes a good look at the series of conferences between the parties in the fall of 1961, it is rather easy to find that they were mere preliminary negotiations on the financing of plaintiff's business and neither party seriously considered himself contractually bound. It is undisputed that defendant warned plaintiff that all arrangements had to be approved by the main office, and that plaintiff was well acquainted with the operations of a large rubber company such as defendant. No definite or final terms were agreed upon during this series of transactions, and I so find.

Plaintiffs' authorities, such as Jack's Cookie Co. v. Brooks, 227 F.2d 935 (4th Cir. 1955); Hunts Foods, Inc. v. Wellington Phillips et al., 248 F.2d 23 (9th Cir. 1957), and others, completely miss our factual background. If the record supported a finding that plaintiffs relied on an oral agreement or, in fact, accepted certain offers of the defendant, while relying on such offers, such authorities would be of value.

Aside from these findings is the undisputed fact that the parties seemed to formalize their previous negotiations by entering into a consignment agreement on December 27th, which by its terms superseded all prior agreements on the subject of furnishing, selling or consigning tires. This agreement is additional evidence that the parties never intended their previous negotiations to reach the

dignity of a formal offer and acceptance on which Wright could place reliance.

■ If an essential element of a promise is reserved for future agreement of the parties, the promise cannot give rise to a legal obligation until the performance of the future agreement. The Oregon Supreme Court has clearly enunciated this rule in Reed v. Montgomery, 180 Or. 196, 175 P.2d 986 (1947). The exception recognized in Union States Life Ins. Co. v. Bernert, 161 Or. 44, 87 P.2d 774 (1939), i. e. that the rule is not applicable where mere details only are involved, cannot be utilized on the record here presented. The method and amount of financing, the most important element of the promise as claimed by plaintiffs, was never finalized. The rule stated in Reed is adhered to in Carson, Admx. v. McMahon, Admr., 215 Or. 38, 332 P.2d 84, 73 A.L.R.2d 981 (1958).

■ 1(b). Next, plaintiffs' urge that the negotiations between the parties on December 26th and 27th, 1961, reached the level of a valid bilateral contract. An exhaustive analysis of the record convinces me otherwise. There is little question but that the plaintiff Wright and the Pacific Coast representatives of the defendant reached a satisfactory agreement. The vital inquiry is whether the agreement was subject to approval by the head office of defendant in New York City. If such approval was necessary, it constituted a condition precedent and the contract is unenforceable until the condition is performed. Rogers v. Maloney, 85 Or. 61, 165 P. 357 (1917). There is a sharp dispute on whether the approval of the head office was required. Of the two principal witnesses on the subject, Mr. Wright and Mr. Moran, I prefer to believe the latter. On this subject, Wright was quite unconvincing. That he knew there was a difference between sales and credit assistance matters and that each required a separate, high level, corporate approval is beyond question. Moran was a forthright witness and I have no difficulty in finding that his version of the Christmas time meeting with Wright is correct. In other words, I find that Wright was advised by Moran that the latter had no authority whatsoever to give any assurance on long range financing. That Wright, at that time, was in a desperate situation is beyond dispute. He was then in the position of being *fired* by Firestone, he had committed himself far beyond his means in connection with the opening of a new agency. Thus situated, he talked Moran into a loan of $5,000.00 worth of tires as a temporary measure, pending the preparation of the recommendation and consideration of his application by higher authority. Although the date of this meeting is in dispute, I do not believe this is of any particular significance. It is my finding that Moran never told Wright that a recommendation for long range financing had been approved. Wright's testimony that Moran told him that the financing had been approved by New York, all in the presence of Moorehouse, is further weakened by the flat and complete denial of the latter. For that matter, it is quite questionable as to whether Moran met with Wright and Moorehouse on that occasion. Moreover, I am convinced that McGuiness, at one of the Christmas time meetings, read a letter from the head office in New York, which outlined the limitation of the kind, amount and form of the defendant's sales assistance program. Without going into further detail, I find that this issue depends on the credibility of the witnesses and that the testimony of Moran is corroborated by the testimony of other witnesses and by the written record, while the testimony of the plaintiff Wright is almost unwholly unsupported and in some instances unbelievable. The truth is that the plaintiff Wright, being discharged by Firestone, found himself in a very involved financial situation and took a long, long chance on the head office in New York going forward with the approval of the financial arrangements proposed in Seattle. For that matter, at the time of the alleged Christmas agreement, the defendant had already committed himself on the land lease; for a vast amount of equipment,

and for practically everything necessary to operate his contemplated business, with the exception of financing. Plaintiffs have failed to carry their burden on proving a bilateral contract between Wright and defendant.

 2. I have already touched on many aspects of plaintiffs' proposal of liability on a theory of promissory estoppel. On this theory, plaintiffs rely on the Restatement of Contracts, § 90,[1] as construed in Goodman v. Dicker, 83 U.S. App.D.C. 353, 169 F.2d 684 (1948) and other cases. Restatement of Contracts, § 91, requires that the promise inducing the reliance must be unconditional. The facts before me do not require an application of the rule for two reasons: (1) a failure to prove reliance on a promise. There is no question but that the plaintiff did expend large sums of money and did enter a new business with the hope that defendant would furnish the necessary financing. Originally, plaintiff thought he could protect defendant on this financing by securing a satisfactory surety. This was never accomplished and from that time on Wright was taking his chances, at times, as great as a poker draw to an inside straight. Like the gambler who is already over-committed to the pot, Wright felt he had no alternative. He went ahead, not in reliance on promises made by defendant, but in complete desperation on finding no other alternative. If I found myself in the same position, I probably would feel there was nothing more to be lost and take the same chance. Thus far, I have not mentioned the testimony of Mrs. Wright. She was a highly emotional and very positive witness. Unfortunately for the plaintiffs, I cannot reconcile her testimony with the admitted facts and other credible evidence in the case. (2) I previously found that the promise of financial assistance lacked one essential ingredient, that is

the approval of the head office in New York.

 I do not believe that the Oregon statute of frauds has any application to plaintiffs' theories of recovery, nor would the Oregon parol evidence rule apply to plaintiffs' theories 1(a) and 2. If the parol evidence rule is applied to plaintiffs' 1(b), a more difficult problem is presented. However, plaintiffs' theory of liability is not premised on the written consignment. For that matter, even defendant contends that the written consignment was a mere stop gap or temporary arrangement. Consequently, in my opinion, the parol evidence rule should not be employed.

I have this day signed additional findings, conclusions and a judgment dismissing plaintiffs' cause and granting a money judgment to the defendant.

---

1. "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."